

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-22-00202-CV

———————————————————

IN THE INTEREST OF I.B., I.B., AND J.B., CHILDREN

On Appeal from the 97th District Court
Archer County, Texas
Trial Court No. 2020-0001A-CV

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

### I. Introduction

After a bench trial before an associate judge and a hearing de novo before the district judge, the district judge signed a judgment terminating the parental rights of I.B. (Father) and appellant B.K. (Mother) to their three children: Abby, Brian, and Charles.[1] Mother appealed. Father *did not*.

In two issues, Mother contends that (1) the trial court denied her the right to a de novo hearing by prohibiting her from presenting evidence and (2) the evidence is legally and factually insufficient to support the trial court's finding that termination of the parent–child relationship was in the children's best interest. Because Mother agreed that the district judge would base his decision on the evidence presented to the associate judge and the parties' briefs, estoppel bars Mother's first issue. As for her second issue, after reviewing the record, we hold that the evidence is both legally and factually sufficient to support the district court's best-interest finding. We overrule both of Mother's issues and affirm the trial court's judgment.

### II. The Removal

According to the affidavit supporting the Texas Department of Family and Protective Service's original petition, the Department became involved after receiving

---

[1]We use aliases to identify the children, and we identify family members by their relationship to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2). We use pseudonyms for other persons whose names might indirectly identify the children.

a report that on November 11, 2019, Mother, Abby, Brian, and Charles were inside a house when the police arrested three people—Mother not among them—for possession of illegal drugs. Methamphetamine was allegedly left on a table where the children had access to it.

When the Department's investigator spoke with Mother three days later, she denied having been at the house and denied any current or past drug use. Mother agreed to take a urinalysis test (UA) the following day in Wichita Falls.

The next day, however, Mother texted the investigator to say that she could not go to Wichita Falls because she was sick. After three failed attempts by text message to get Mother to take a drug test, the investigator went to Mother's home on December 4, 2019. Mother was there, but she again maintained that she was sick. Mother refused to take a UA in Wichita Falls, instructed the investigator to get a court order, and slammed the door.

The investigator proceeded to interview the three arrestees. One confirmed that Mother and the children were present both when the three were using drugs and when the arrests occurred. One denied that Mother was there. And the third said that Mother had been there earlier but had left before the arrests.

Father, who had been in the county jail since April 2019 for violating a protective order, told the investigator that Mother had diabetes and had been hospitalized multiple times due to complications. According to Father, he had not known Mother to use drugs but had heard that she had started using them. Their last

fight was over Mother's going out drinking with her friends; someone had told him that Mother was leaving the children alone at home. Father acknowledged having himself used methamphetamine for over fifteen years.

The Department ultimately procured an order requiring Mother to take a hair-follicle drug test, and on December 30, 2019, the results from the drug test came back positive for methamphetamine.

On the same date, the trial court signed an emergency order naming the Department as the children's temporary sole managing conservator. The Department filed its "Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship" on January 2, 2020.

Due to COVID-19 delays, the trial before the associate judge did not occur until over two years later, on January 21, 2022.[2]

### III.  Trial De Novo

In Mother's first issue, she contends that the trial court denied her the right to a de novo hearing by prohibiting her from presenting evidence. We disagree. Mother is

---

[2]On December 18, 2020, the trial court extended the dismissal date to July 2, 2021. *See* Tex. Fam. Code Ann. § 263.401(b). On June 18, 2021, the trial court further extended the dismissal date to "February 1, 2021," although contextually it meant February 1, 2022. *See Thirty-Eighth Emer. Order Regarding COVID-19 State of Disaster*, 629 S.W.3d 900, 900–01 (Tex. 2021) ("[F]or any . . . proceeding [under Subtitle E, Title 5 of the Family Code] that, on the date of this Order, has been previously retained on the court's docket pursuant . . . to Section 263.401(b) or (b-1), the court may extend the dismissal date . . . no later than February 1, 2022 . . . .").

estopped from raising this attack because she invited the very purported error about which she complains.

After a trial before an associate judge, de novo hearings before the referring court (that is, the court that had referred the matter to the associate judge) are governed by Section 201.015 of the Texas Family Code. Tex. Fam. Code Ann. § 201.015. Section 201.015 calls for a de novo hearing, not a de novo trial; the referring court may consider the record from the trial before the associate judge, and whether new evidence is necessary depends on the issues designated in the appealing party's de-novo-hearing request. *See In re A.L.M.-F.*, 593 S.W.3d 271, 277–80 (Tex. 2019) (discussing Section 201.015); *see also* Tex. Fam. Code Ann. § 201.015(c).

Turning to Mother's request, she specifically asked that the "*de novo* hearing be heard by submission and based solely on the record and written argument of counsel." Mother's prayer repeated that she did not want to present any new evidence. When setting the de novo hearing, the district court checked the box in its order providing for a nonevidentiary hearing by submission. The trial court thus granted Mother precisely the relief that she requested.

"[A] party who requests relief cannot complain on appeal if that relief is granted." *In re J.L.C.*, 194 S.W.3d 667, 673 (Tex. App.—Fort Worth 2006, no pet.). "It is an elementary principle supported by many authorities that a litigant cannot ask something of a court and then complain that the court committed error in giving it to him. The rule, grounded in even justice and dictated by common sense, is that he is

5

estopped." *Ne. Tex. Motor Lines, Inc. v. Hodges*, 158 S.W.2d 487, 488 (Tex. [Comm'n Op.] 1942). We overrule Mother's first issue.

## IV. Legal and Factual Sufficiency of the Evidence

### A. Legal Principles

#### 1. Generally

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001(b), 161.206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds that are listed in Subsection 161.001(b)(1) of the Texas Family Code and (2) termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## 2. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental-rights-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved both the particular ground for termination and that termination was in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment, and we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We also must disregard all evidence contrary to the finding that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor; that is the factfinder's province. *J.P.B.,*

180 S.W.3d at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

### 3. Factual Sufficiency

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support terminating a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In a factual-sufficiency review, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction that the parent violated an alleged ground and that termination was in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### 4. Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence that is probative of grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2). *Id.* at 249; *C.H.*, 89 S.W.3d at

8

28. Nonexclusive factors that the factfinder in a termination case may also use in determining the child's best interest include

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *7 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.); *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

9

**B. Discussion of *Holley* Factors**

**1. Children's desires**

This factor does not apply. The children, all under six years old at the time of trial, lacked sufficient maturity to express an opinion on parental preference, and none of them testified at trial. *See In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *18 (Tex. App. —Fort Worth June 28, 2021, pet. denied) (mem. op. on reh'g).

**2. Children's emotional and physical needs now and in the future**

Brian had a heart murmur that required checkups. The Department suspected that Abby had autism, but diagnosticians later ruled it out and attributed her behavior instead to speech delays from neglect before her removal. All three children had received speech therapy, which had proved beneficial. Charles had defiance issues, which the case manager described as an "uphill battle." Brian had behavioral issues too, but therapy had helped him. All three children were doing well in school.

The children's emotional and physical needs are currently being met. The record suggests that these needs were, at least to some extent, not being met while the children were in Mother's care. As discussed further below, the record also shows that Mother's inability to meet her own needs bodes poorly for her ability to meet her children's future needs. This factor favors termination.

### 3. Emotional and physical danger to the children now and in the future

Mother denied being at the drug bust that launched these proceedings. But Mother did not dispute that Jane Doe,[3] one of the people arrested there, was her friend.

In November 2020, Mother told the Department of Mental Health and Mental Retardation (MHMR) that she had started using methamphetamine in February 2019 and that she had used it several times a month. MHMR did not recommend inpatient or outpatient care because Mother did not meet the criteria; instead it recommended that Mother continue to be tested. Mother's case manager agreed that Mother's substance-abuse issues were related to her mental health and that what Mother needed was counseling.

Drug testing Mother did not always go smoothly. The case manager said that Mother was a no-show for an April 2021 test. Mother disagreed, claiming that she had shown up for the test but could not take it because the service-authorization date was wrong, an assertion the case manager disputed.

Mother maintained that she had used methamphetamine only once before this case began and only once afterward. Mother admitted that she had tested positive for methamphetamine when the case first started. As for later use, Mother estimated that she had used methamphetamine in September or October 2020. But Mother's

---

[3]"Jane Doe" is a pseudonym.

counselor's notes from October 2021 reflected that Mother had tested positive for methamphetamine in October 2021 when she was hospitalized for diabetic complications. Asked about this positive test, Mother equivocated: "As far as I know, I did not test positive for anything." Mother's termination trial occurred a mere three months later, in January 2022.

Mother reported to her counselor that in February 2018 Father had tried to kill her in front of Abby, Brian, and Charles. When asked at trial whether she recalled telling her counselor that, Mother responded, "I remember saying he assaulted me." At trial, Mother stated that Father had hurt her in front of the children and agreed that Father had "[s]orta" put the children in danger. Mother maintained that Father had assaulted her only the one time.

Mother claimed that she had not been in a romantic relationship with Father since December 2017 or with anyone else since these proceedings started in October 2019. When asked who John Smith[4] was, Mother responded, "He's just a close friend." She acknowledged sharing a motel room with him perhaps as many as five times and admitted that he had spent the night at her home a couple of times. She did not recall ever telling the police that he was her boyfriend.

But according to Mother's case manager, Mother told her in September 2020 that Mother and Smith had been in a relationship. Mother testified that after

---

[4]"John Smith" is a pseudonym.

Smith assaulted her in 2020, she called their relationship off and had not seen him since. Mother maintained that that was the only time Smith had assaulted her, something the police reports indicated had happened in May 2020. Although Mother denied seeing Smith at all during the year 2021, three later police reports showed otherwise and revealed the chaotic and volatile nature of their relationship.

The first report involved a September 2021 incident involving Smith, Mother, and Bob Jones.[5] Smith had called the police to complain that Jones had hit him with a hammer. According to the report, when Smith went to a house where Mother, "his girlfriend," was staying to get a check from her, Jones came outside and threw hammers at him. While trying to get an answer at that house, the police noticed Mother and another woman leaving the house next door. Inside that house, the police found Jones hiding in a pantry and arrested him. Mother's case manager testified that Jones had just gotten out of jail and that Mother had violated her service plan because she was not supposed to associate with anyone who was engaging in criminal activity.

The second police report, from October 2021, placed Mother and Smith together again, and it too involved violence. The police were dispatched to a motel where they met Mother, who told them that she and her boyfriend, Smith, were staying at the motel and had begun to argue. She related that Smith had become angry, lifted her up by her neck, and thrown her on a bed, where he had choked her

---

[5]"Bob Jones" is a pseudonym.

to the point that she believed that she would pass out. When questioned, Smith denied everything and explained that Mother was "stressed due to a CPS case and ha[d] been up for several days." The police arrested Smith for assault family violence with choking.[6]

The third report showed that she and Smith had been together as recently as November 2021 and, like the other incidents, this one also involved violence. Wendy Williams[7] approached a police officer on his meal break at a restaurant to say that two people were having a very heated domestic argument at her house about the female's getting the male in legal trouble. Williams identified the male as Smith and the female as Mother and explained that a protective order was supposed to keep the two separated. Williams wanted Smith and Mother removed from her house. After arriving there, and while talking to Smith, the police found Mother hiding behind Smith's bedroom door, which indicated to the police that both Smith and Mother knew about the protective order. Williams then produced a copy of the protective order that Smith had given to her; both Smith and Mother denied any knowledge of it. After interviewing Williams and the homeowner, the police determined that Mother and Smith had been arguing about Mother's being responsible for Smith's

---

[6]In this police report, Mother's last name is misspelled. Mother disputed whether she was the victim named in the report: "Since it's misspelled, I don't know if they mean me or not." The report, however, identifies more than just the victim's name; it lists the victim's birth date, which matches Mother's.

[7]"Wendy Williams" is a pseudonym.

recent arrest. The police arrested Smith again, this time for violating the protective order.

In addition to the police reports, the factfinder heard from the case manager that Mother had admitted keeping company with people who were using drugs and, further, using drugs herself. Additionally, Mother acknowledged to her case manager that Mother knew that her friend Doe was using methamphetamine. From her own involvement, the case manager knew that Doe had convictions for injuring children. With this background, Mother's case manager stated—and a reasonable factfinder could have readily believed—that Mother had continued to associate with people who posed a safety risk to both Mother and her children.

The evidence thus showed that Mother—through her use of drugs, choice of drug-using friends, and relationships with violent boyfriends—posed a danger to her children now and in the future. This factor weighs in favor of termination.

### 4. (1) Parental abilities of the individuals seeking custody and (2) programs available to assist these individuals to promote the children's best interest

The case manager agreed that at times Mother had shown good parenting ability. For example, when the case manager monitored Mother's visits with the children, Mother behaved appropriately with them. Mother engaged in their activities and attempted to discipline them properly when necessary. Although the case manager had no doubt that Mother loved her children, the case manager stated that Mother's methamphetamine use negated all of Mother's good parenting abilities.

15

When asked what her greatest concern was, the case manager responded, "[Mother's] ability to self-protect [from her bad choices of friends and relationships] causes me probably just as [much] concern[] as drug use because I worry if she can't protect herself, how is she going to make sure these kids are protected[?]" Mother went from an abusive relationship with Father to an abusive relationship with Smith. The case manager stated that the primary reason for removing the children was drug use, but she did not believe that Mother had addressed that problem: "Drugs are still an issue with [Mother] even if she's not the one using them." Although the case manager acknowledged that Mother had never failed a urine test, she had missed scheduled tests.

Mother's beginning to seek drug counseling shortly before trial did not impress the case manager. Because of COVID, Mother's case had been going on for nearly two years, giving her that much time to complete her services. The case manager considered Mother's belated attempt to start drug-abuse counseling to be "ridiculous" and had no reason to believe the results would be any different.

From all the above, a factfinder could have reasonably concluded that the dangers that Mother posed to her children when coupled with her unwillingness or inability to address these issues outweighed Mother's parenting ability. These factors weigh in favor of termination.

**5. (1) Parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one and (2) parent's excuses, if any, for their acts or omissions**

At the time of trial, Mother was 32 years old. Mother asserted that her stable source of income was her father, who was 70; he shared his social security with her. When asked why her father would pay her bills, she responded, "Because he is there to support me. He wanted me to get better -- try to get better control and not be as stressed out so I wouldn't go into DKA.[8] And so it's a way of him supporting me." To the case manager, Mother never seemed uncomfortable relying on her elderly father, who was himself diabetic, to pay all her bills.[9]

Although the case manager testified that Mother had never provided proof of employment, Mother maintained that she had worked as a home-healthcare worker. That work ended in September 2020 when her lone client was arrested for possession of methamphetamine. Mother was in the car with her client when the police made the arrest.

Mother had no car or driver's license, relying on others to pick her up and give her rides and voicing a reluctance to drive because of vision loss in one eye that had occurred in 2015. But in July 2020, the police pulled Mother over for driving a car

---

[8]"DKA" is short for diabetic ketoacidosis.

[9]The Department even suspected that Mother and her father lived together—or perhaps more accurately, that Mother was living with her father, given that her father was paying all the bills—which might have explained why Mother did not permit the case manager to see the bedrooms in her house.

without a functional brake light and issued her three citations; she had no insurance and no valid driver's license.[10]

Mother also did not properly tend to her insulin-dependent Type 1 diabetes. If her blood sugar levels went too high and stayed too high, she would suffer from DKA. Despite having diabetes, she did not see an endocrinologist, nor did she see her primary doctor as recommended. She estimated that since October 2019, she had been hospitalized six to seven times for DKA, each time remaining hospitalized for four to five days. She explained that when a person's blood-sugar levels go too high, the body becomes insulin resistant—that is, insulin will no longer work to lower the person's blood-sugar levels. She agreed that a person could reach "a point of no return" and die. Mother maintained that she checked her blood-sugar levels four to six times a day and that she took both long- and short-acting insulin.[11]

Mother had no health insurance, was not on Medicaid, and received no social-security benefits. Although lacking health insurance, Mother declined to apply for

---

[10]Smith, who had an active arrest warrant, was Mother's passenger. The police arrested him and impounded the car.

[11]Mother was the only source for information about diabetes. Mother acknowledged that DKA could kill her, but she was nevertheless repeatedly hospitalized for it. Father told the investigator that even before the Department's involvement, Mother had been in the hospital multiple times due to complications from diabetes. Mother's frequent hospitalizations suggest that Mother managed her diabetes poorly. Without additional testimony, however, it is not clear. Similarly, the record did not show whether Mother's father purchased insulin for her outright—without insurance—or whether her diabetic father simply shared his insulin supply with her.

Medicaid, asserting that she would not be approved. The case manager had repeatedly urged Mother to apply for social security, but to no avail. Mother was unconcerned about not having health insurance and never told her case manager how much her father was paying for insulin.

In short, Mother was not taking responsibility for her own health or her own finances. A reasonable factfinder could have concluded that Mother would show no more initiative when taking care of her three children than she did in taking care of herself. These factors weigh in favor of termination.

### 6. Plans for the children by the individual or by the agency seeking custody

Mother's plan for her children was straightforward: she "plan[ned] on keeping a stable home and making sure they're in school and give them a loving, stable environment." Implicit in Mother's plan was that she could provide a safe and stable home. But as discussed, a reasonable factfinder could have concluded that any home that Mother provided would be neither safe nor stable.

The Department's plan was less clear. If Mother's parental rights were terminated, the Department hoped to place the children for adoption as a sibling group. At the time of trial, because the Department had not found a foster home that could take all three, the children were in two different foster homes, neither of which was an adoptive home. The Department had, however, located an adoptive placement that would potentially take all three children, the children were visiting that home

19

every other weekend on what were referred to as "preplacement visits" or "respite care," and the children were adjusting well to the prospect of being adopted. Regardless, the goal was a safe and stable adoptive placement and, until then, the safety and relative stability of foster placements. Returning the children to Mother would not be safe or stable. *See In re M.T.*, No. 02-22-00111-CV, 2022 WL 2353095, at *5 (Tex. App.—Fort Worth June 30, 2022, no pet.) (mem. op.) ("Although there was no evidence about M.T.'s then-current living conditions—other than that she was in foster care—the trial court could have determined that given the choice between foster care and Mother's care, foster care would be the more stable of the two."). This factor weighs in favor of termination.

### 7. Economic disadvantage

Mother argues, "The best interest standard cannot be met by showing merely that Mother is economically disadvantaged and that the children might be better off living elsewhere . . . ." We agree that termination cannot be based on economic disadvantage. We disagree that termination occurred here on that basis. In its judgment, the trial court specifically found that economic disadvantage was not the basis of its order. As discussed above, the record does not show that the Department removed the children or that the trial court terminated Mother's parental rights because she was poor; much more was involved.

## 8. Holding

Based on our review of the *Holley* factors as applied to the evidence here, we hold that the evidence is legally and factually sufficient to show that terminating Mother's parental rights was in the best interest of Abby, Brian, and Charles. *See J.F.C.*, 96 S.W.3d at 265–66; *In re C.W.*, No. 02-21-00252-CV, 2022 WL 123221, at *13 (Tex. App.—Fort Worth Jan. 13, 2022, no pet.) (mem. op.). We overrule Mother's second issue.

## V. Conclusion

Having overruled Mother's issues, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: October 27, 2022

21